Filed 11/20/24  P. v. Pleitez CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B323204 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA474194) |
| v. | |
| JEAN SERAFIN PLEITEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David R. Fields, Judge.  Affirmed.

Patricia S. Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jean Serafin Pleitez (defendant) appeals from the judgment entered after he was convicted of three offenses of sexual assault.  He contends substantial evidence does not support count 3, sexual penetration by means of force or fear; the trial court improperly questioned jurors regarding a possible impasse and gave an improper instruction; and the prosecutor engaged in misconduct during summation.  Defendant further contends the cumulative effect of these errors requires reversal, and the trial court erred in imposing a consecutive sentence for count 3.  We find no merit to defendant's contentions and affirm the judgment.

## BACKGROUND

Defendant was charged with three counts of sexual penetration with a foreign object against Holly H. in violation of Penal Code section 289, subdivisions (a), (c), and (d),[1] committed as follows: subdivision (d), against an unconscious person (count 1); subdivision (c), against an intoxicated person (count 2); and subdivision (a)(1)(A), by force or fear (count 3).  The information also alleged kidnapping of Holly H. in violation of section 207, subdivision (a) (count 4).

A jury convicted defendant of counts 1 through 3 and acquitted him of kidnapping.  On July 14, 2022, the trial court sentenced defendant to a total term of 12 years in prison.  As to count 1, the middle term of six years was imposed and stayed pursuant to section 654.  The court imposed the middle term of

---

[1]     All further unattributed code sections are to the Penal Code unless otherwise stated.

2

six years as to count 2. As to count 3, a consecutive middle term of six years was imposed for a total of 12 years.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

On April 21, 2018, Holly was 23 years old and planned to attend two of her friends' birthday parties. She arrived at the first party at the Bungalow Bar in Santa Monica at 2:00 p.m. and stayed over five hours, until about 7:30 p.m. The guests were provided with jugs of mixed drinks set out with glasses they could fill themselves. Holly testified she probably drank about five glasses, three "mojitos" (a rum drink) and two "Moscow Mules" (a vodka drink), although it was difficult to be certain because sometimes she filled an empty glass and sometimes she just added more to what was already in her glass. By the time she left the party she was intoxicated.

She texted her friend Emma, whom she was planning to meet at the second party, "Getting there at 8:00 latest." That party was to begin at 8:00 p.m. at the Break Room 86 bar in the Koreatown neighborhood of Los Angeles. Holly knew it took about 20 to 30 minutes to get there, so at approximately 7:30 p.m., she ordered an Uber to take her to the second party. Uber was her regular means of transportation and she had used it many times. The Uber phone application gives the license plate number of the car picking up, and whenever a car arrived for her, Holly would check the license plate to ensure a match. She believed she did so that night, but her memory was unclear. She also had an unclear memory of getting into the car. It was her habit to always get into the backseat of an Uber, but she could not recall whether she did on this occasion.

3

The Uber application allows a user to select one of several types of rides, and Holly usually ordered a regular Uber, meaning a ride for one passenger, going from point A to point B. Uber Pool is a shared ride with other users nearby, to be dropped off on a similar route. Holly did not realize until later that she had inadvertently ordered an Uber Pool ride, though she did not remember picking up or dropping off other passengers.

Once in the car Holly passed out. She believed it was because she was drunk and tired. Her next memory was waking up in the front seat of the Uber with the seat fully reclined. She did not remember how she got into the front seat or how the seat was reclined. She felt something in her vagina, was confused and did not understand what was happening. It took Holly several minutes to wake up, come to, and realize the driver's fingers were inside her vagina. She was wearing a skirt that night, and he had pushed her underwear to the side. The driver, whom she identified as defendant, was moving two fingers in and out of her vagina with his right hand, with his penis exposed, using his left hand to masturbate while steering the car with the bottom of the steering wheel. The car was moving slowly, about 5 miles per hour or less in a dark, residential neighborhood that was unfamiliar to Holly.

As she came to, Holly "started pressing on [defendant's] hands, trying to push them out." She said, "No, no, no," progressively louder. Defendant was "forcibly keeping" his fingers inside her vagina, and she "forcibly had to push them," using both her hands with all her strength for about two minutes to push his fingers out of her. Holly described defendant as "much, much, much bigger than" she and much stronger. Holly

4

was five feet four inches tall and weighed about 130 pounds at the time.

After defendant's fingers were out of her vagina, defendant offered her cocaine, tequila, and marijuana.  She put the seat up straight, retrieved her phone from the floorboard, and saw text messages from friends.  She replied that her Uber driver was trying to rape her and was fingering her.  She was afraid defendant was going to rape or kill her, so she shared her location with a friend using the Uber application.

Alaina Hartley, Holly's friend of five years, testified she was at a comedy show in West Hollywood when she received the map from the Uber application showing Holly's location.  Hartley initially thought it was a joke, and sent a lighthearted response: "Thank you for inviting me to follow your Uber ride?!  Hahaha."  Holly then texted, "My Ubee [*sic*] driver tried to rape me."  Holly's next message said, "Fingering me."  Alarmed, Hartley immediately left the comedy club and unsuccessfully tried texting and calling Holly.  When Hartley reached Holly by phone, her voice was "super strained," she spoke in a high octave that did not sound like her voice and was speaking very slowly.  Holly's responses gave Hartley the impression she was not free to talk, so Hartley asked yes or no questions.  She learned that Holly was still in the car, did not feel safe, and did not know how to get out.  After Hartley advised her what to say, she heard Holly say, "Excuse me, sir, can you please pull over?"  Hartley ran to her car and told Holly to stay on the phone until she was in a safe place.  Hartley also heard Holly say something like, "Right here, right here."  When Holly told Hartley she was out of the car, Holly was sobbing uncontrollably and did not know where she was.

Hartley soon arrived at Holly's location near Wilshire and Crenshaw Boulevards in a dark area with light traffic and no pedestrians.  Holly was hysterical.  Hartley described Holly as normally poised, but there she was unable to speak or focus.  She was disheveled, her skirt was turned around a bit, and her sweater was a bit off her shoulder, which was unusual.

Alexia Garcia and Holly were also friends, and over the preceding five years they had seen each other almost daily.  When Garcia received a text from Holly at 8:35 p.m. that night, Garcia called her right away.  Holly texted, "My Uber driver tried to rape me."  Garcia then called Holly, who was whispering, sounding shocked and confused.  Holly also sounded nervous, her voice was shaking, quivering, and there were awkward silences.  Garcia asked whether Holly was okay and whether she was safe.  Holly eventually replied no to the two questions.  Garcia asked where Holly was going and learned Holly was still in the Uber.  Garcia heard her asking someone how far it was to the drop off.  The call was then disconnected, and Garcia unsuccessfully tried to call her back several times.  Garcia then texted Hartley and the three of them were on a call together for a few minutes.  After the call, Garcia drove to the location Hartley had sent her.  When she arrived 15 to 20 minutes later, it was dark out, Holly was crying and shivering, with her arms around her shoulders.  Hartley and two uniformed police officers were there.

Holly testified defendant did not let her out when she first asked, and kept driving.  She then said her friend was right there, and asked to please be let out.  Defendant still kept driving.  When he slowed down, but did not stop, she got out while the car was moving.  She had no idea where she was, so she sprinted two blocks to the next busy intersection out of fear he

6

would get out and follow her. When she no longer saw defendant's car she called 911 and told the dispatcher what had happened. She also gave defendant's physical description, the type of car, and his license plate number. The Uber application also had defendant's photograph. Two police officers arrived, and Holly told them defendant had stuck his fingers in her vagina against her will. Holly's friends Garcia and Hartley then arrived and the police took her to the Santa Monica Rape Treatment Center where she underwent a sexual assault exam.

Officer Brian Lee, the investigating officer in this case, spoke to Holly and interviewed Hartley and Garcia by phone. The following month he interviewed defendant in person. The interview was videorecorded and played for the jury. Defendant said he picked up a female passenger at the Bungalow in Santa Monica sometime between 5:00 and 7:00 p.m. She was drunk, got into the front seat and passed out right away. He then picked up two other passengers who sat in the backseat. One of the other passengers asked what happened to her. Defendant said he did not know. After defendant dropped off the other two passengers, he proceeded to Holly's destination in Koreatown. Defendant chose not to take the freeway because Holly hiccupped and looked like she was going to throw up. He claimed to have told her he had bags in the car and to let him know if she wanted to throw up or if she wanted some water. She reportedly replied, "Aaaahh, I'm fine, I'm fine." Defendant told Officer Lee he thought she was on something and did not know whether it was just alcohol.

Defendant also said his passenger's hand was out the window and he brought it back in, which he described as a "mistake." He explained she was kind of drunk and "throwing out," so he told her if she threw out in his car she would pay the

7

$350 fine.  When defendant told the woman her phone fell down under the seat she said, "Oh, okay," and started talking to somebody on the phone.  When he reached Crenshaw and Wilshire Boulevards she told him to drop her off because someone was going to pick her up.  He then pulled over, she got out, and said thank you.  He got another call and kept working.

Defendant denied ever having touched the woman except when he brought her arm back into the car.  Defendant understood she was accusing him of something very serious, not just touching her hand.  He told Officer Lee when Uber inquired whether he had touched her, he replied,  "No, I never touched her.  She was, she was drunk.  And she passed out.  What, what . . . and . . . why am I gonna lose my job just for touching a drunk girl?"  Defendant insisted he never touched her breasts, never touched her vagina, only her arm to bring it back inside.  Asked whether that meant his DNA would not be found inside her, defendant agreed.  Officer Lee asked for defendant's consent to collect his DNA, telling him if it "is not on her, then you're good."  Defendant replied, "What do you mean?  Like, uh, uh . . . why she didn't call the police or something?"  Officer Lee said she did, right afterward.  Defendant signed a DNA consent form and a swab was taken.

Defendant denied reclining the front passenger seat, saying the mechanism was automatic and suggested that maybe she touched something.  He also claimed the seat only went back a little bit.  The next day defendant saw his Uber application had been deactivated, so he called and was told he was under investigation.  Defendant then volunteered that his passenger had been half-naked.  Asked what he meant, he said she was wearing a mini skirt, and then agreed his DNA might be on her

8

thighs or leg but he was certain not inside her vagina. Defendant was released after the interview.

Officer Lee received information from Uber pursuant to a warrant and was able to confirm that during Holly's ride on April 21, 2018, defendant had two other passengers. Officer Lee interviewed one who gave a statement of her observations, and received an e-mail from the other. Officer Lee then applied for a warrant for defendant's arrest. Another interview of defendant was audio-recorded and later played for the jury. Officer Lee used an investigative ruse to make it appear the police had more evidence than they did by telling that to defendant. Officer Lee's purpose was to lead defendant to believe they had DNA evidence, but kept it vague. Defendant was asked to tell in his own words what happened.

Defendant said Holly grabbed his hand and put it in her top. He said he was "fooled by that girl," and she had used him. He said she knew what she was doing. Defendant claimed *she* put his right hand on her body, even her vagina, and held it there, putting pressure on it for a little bit. When asked whether it was "seconds, or like—," defendant replied, "Yeah. Yeah, yeah, yeah, yeah." When asked whether she said anything, defendant replied, "Uh, no, no, no, no, no, no, no." Asked whether that was how his DNA got on her body, defendant first replied, "Yeah, yeah, yeah," but then said, "I don't know, she fooled me," and "I was used." Defendant said she wanted money from Uber. Defendant insisted he was not a bad guy and was not trying to take advantage of her, but she knew what she was doing and got him into that.

Officer Lee suggested since now they had new evidence, it was the time to come clean, reminding defendant he had denied

9

touching Holly the first time they talked.  Defendant knew he had made a mistake but he "was used by that mistake."  He repeated she grabbed his hand and pressed it down, and, "Yeah, it just happened, like I say, it was just . . . like playing around. . . .  I could've take[n] advantage of her, she was drunk.  But I, like I say, I'm not that kind of guy . . . We all make mistakes."  Defendant asked officers to tell Uber "a lot of girls, they're doing this shit" to trick drivers and get money, adding, "And . . . hey, we, we, we're mens."  Defendant also claimed this had never happened to him before.

Defendant said Holly was "almost naked," wearing a cheerleader type skirt.  He added he "was playing, playing with her just a little bit."  Officer Lee responded, "So, you *were* playing with her?"  Defendant replied, "Yeah.  And, and, and then she, she, she grabbed my hands and then, you know, like um, she want more."  He explained she put her hand on his after he put his hand on her.  Asked whether Holly "made [him] go inside, under her skirt," defendant said, "I did—yeah, I don't remember going inside . . . . You know, it was just like . . . it was just a little bit."  When asked if his hand went under her underwear, defendant replied, "Yeah, yeah, like a little bit," but he did not remember "going inside her" or "getting wet."  Defendant admitted touching "the top" of her vagina and rubbing her clitoris area.  Defendant was shown a drawing of a vagina, and defendant circled the area where he touched her.

When defendant was asked if there was anything he would like to tell Holly, he said he could not say, "I'm sorry what happened, . . . because . . . she used me."  He added, "I will say I'm sorry when you find something like, you know, I started it, or, but uh, she was provoking, provoking me."  Defendant explained,

10

"She was almost naked and controlled my car." When asked whether she did anything else, defendant said no, but added, "she know what she was doing because she liked it and she grabbed my hand so she can get my . . . my DNA." Defendant denied touching himself and suggested Holly was the one who should be investigated and arrested.

**Defense evidence**

Officer Fernando de Vera testified he and his partner arrived at Wilshire and Crenshaw Boulevards about 15 minutes before Holly's friends and spoke to her there. Holly's clothes appeared to be orderly and not disheveled, but she was distraught, crying, and speaking rapidly as she told them what her Uber driver had done. She said she woke up to his fingers penetrating her vagina, and him masturbating with the other hand. She continuously told him to stop and tried to push his hand away. She said he offered her Cocaine, weed, and alcohol. When she told him to pull over so she could get out of the car, he continued to drive.

Initially Holly was hesitant to go to the Rape Treatment Center and wanted to go to the party she had planned to attend. Eventually she agreed to go to the center after she was asked again and told it would assist the investigation.

Kara Guilfoyle, a registered nurse and nurse practitioner on the Sexual Assault Response Team at the UCLA Rape Treatment Center in Santa Monica testified she conducted a thorough and extremely invasive sexual assault examination on Holly on April 21, 2018, which resulted in no findings.

Holly told her what had happened, and Guilfoyle collected swabs from multiple areas for DNA analysis, including around the mouth, the neck, the breasts, external genitalia, vagina and

11

anus.  Although told that it could be helpful, Holly declined clothing collection, which Guilfoyle described as an entirely personal choice some refuse because they never get the clothes back.  Guilfoyle found no cuts or redness on Holly's body, no semen or other secretions and no signs of interior injuries, redness or trauma.  Guilfoyle explained that upon puberty female genitalia becomes elasticized, such that it can accommodate a penis and the birth of a child without injury, and she would expect a 23-year-old woman to have such elasticity.

## DISCUSSION

### I.    Substantial evidence of force

Defendant contends his conviction of forcible sexual penetration in count 3 was not supported by substantial evidence of force or fear, resulting in a violation of right to due process.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "Although we assess whether the evidence is inherently credible and of solid value, we must also view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence."  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 488.)  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. . . . Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. . . .  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."

(*People v. Young* (2005) 34 Cal.4th 1149, 1181, citations omitted.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Defendant was convicted in count 3 of a violation of section 289, subdivision (a)(1)(A), defined in that section as "an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." Defendant contends the act of sexual penetration was not accomplished by fear because although Holly was afraid defendant would rape or kill her, she did not *submit* due to fear but instead resisted. Citing *People v. Iniguez* (1994) 7 Cal.4th 847, 856, defendant argues fear was not proved as Holly did not *submit* due to fear. Defendant argues the penetration was not accomplished by force, because (in his words) he "used some 'force' when he continued the penetration while [Holly] was trying to move his hand away, but it was no more so than necessary to accomplish the penetration itself." Though defendant cites *People v. Griffin* (2004) 33 Cal.4th 1015, 1027 (*Griffin*), for this assertion, the *Griffin* court did not hold the "force" must be shown to be greater than the force necessary to accomplish the penetration itself. On the contrary, the California Supreme Court rejected that definition and all rigid definitions, holding that "the term 'force' in the rape statute was not intended to have any specialized legal meaning. . . ." (*Id.* at pp. 1023, 1024, 1027–1028.) The *Griffin* court reviewed definitions of force in various crimes and contexts and concluded the degree of force need only be sufficient to support a finding

13

that the act of sexual penetration was against the will of the victim.[2]  (*Griffin*, at pp. 1023–1024.)

Defendant acknowledges *Griffin*'s interpretation and further acknowledges the evidence showed when Holly woke up to find defendant's fingers in her vagina, she expressed her lack of consent by saying "[n]o, no, no" progressively louder, as she began forcibly pushing defendant's hand to remove his fingers, as defendant was preventing her from doing so.  Her actions clearly conveyed her lack of consent and thus showed defendant's action was against her will.  However, defendant quotes part of *Griffin*'s explanation of the difference between "force" as used in section 288 (lewd conduct against a minor) and as used in section 289 (forcible rape) as follows.  "As reflected in the surveyed case law, in a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker."  (*Griffin, supra*, 33 Cal.4th at p. 1027.)  Emphasizing the words, "overcome," "thwart" and "resist," defendant apparently interprets *Griffin*'s definition of sufficient force to overcome the victim's will as meaning (in defendant's words), "*more* than merely an act of sexual penetration against the victim's will."  (Italics added.)  From this quote defendant concludes the *degree* of force used was

---

[2]      "Against one's will" means "without the consent of the alleged victim."  (*People v. Lee* (2011) 51 Cal.4th 620, 634, fn. 10.) "In the context of rape and other sexual assaults, 'consent' is defined as the 'positive cooperation in act or attitude pursuant to an exercise of free will.'"  (*People v. Giardino* (2000) 82 Cal.App.4th 454, 459.)

14

insufficient to support a finding the act of sexual penetration was against Holly's will.[3]

Defendant's argument appears to be because his use of force "was no more so than necessary to accomplish the penetration itself" and Holly managed to resist or thwart defendant's *continued* penetration after two minutes of trying, her efforts were not "overcome." We reject defendant's argument. First, Holly did not successfully resist the attack, as she was unable to stop defendant until he had forcibly penetrated her for an additional time after she woke. In addition, both the degree and kind of physical use of force utilized is immaterial as ""'force" plays merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will."' (*Griffin, supra*, 33 Cal.4th at p. 1025, quoting *People v. Cicero* (1984) 157 Cal.App.3d 465, 475, disapproved on another point in *People v. Soto* (2011) 51 Cal.4th 229, 246–247.) The kind of force ""'may consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will."''" (*Griffin, supra*, at pp. 1028.)

---

[3] To the extent defendant suggests the quoted passage requires the initial penetration to be forcible, or that Holly was required to resist the initial penetration, leaving defendant free to forcibly continue his assault when she woke up, we disagree. The circumstance that "defendant was able to achieve penetration . . . without [the victim's] consent before she was able to register her objection" does not justify forceful continued penetration once she does object. (*Griffin, supra*, 33 Cal.4th at p. 1029.)

Defendant points out the penetration caused Holly no injuries or redness.[4]  Defendant then compares his use of force to the description of the beating, anal penetration with a broomstick and serious injuries inflicted on the victim in *People v. McCann* (2019) 41 Cal.App.5th 149, 158, which was found sufficient to hold the defendant to answer after a preliminary hearing. Nothing in that case, or any other case cited by defendant, holds that only force causing injury is sufficient.  "'Because the fundamental wrong is the violation of a woman's will and sexuality, the law of rape does not require that 'force' cause physical harm." (*Griffin, supra*, 33 Cal.4th at p. 1025.)

We conclude compelling substantial evidence supports the jury's finding defendant's assault was "accomplished against the victim's will by means of force" (§ 289, subd. (a)(1)(A)) such that a rational jury could find him guilty beyond a reasonable doubt. The means of violating section 289, subdivision (a)(1)(A) is stated in the disjunctive: "force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury." (Italics added.)  We thus need not reach defendant's contention regarding means of violating the statute other than force.  In addition, as we find defendant's conviction supported by substantial evidence, we do

---

[4]     Somewhat misstating Guilfoyle's testimony, defendant claims it caused Holly no trauma.  Guilfoyle was asked whether she would have put in her report if there had been "some injuries, some redness or *other* forms of trauma."  (Italics added.) Guilfoyle replied that yes, she would have.  Defendant apparently meant to argue Holly suffered no *physical* trauma, as Holly's friends and Officer de Vera described her emotional state as hysterical and crying (Hartley), crying and shivering (Garcia), and distraught, crying, and speaking rapidly (Officer de Vera).

not reach defendant's contention that insufficiency of the evidence resulted in a violation of his right to due process.

## II.    Nondeliberating juror

Defendant contends the trial court coerced the jury to reach a verdict by questioning a juror (subject juror or Juror No. 3) and then instructing the jury with CALCRIM No. 3551 to continue deliberating, resulting in a violation of his Sixth and Fourteenth Amendment rights to an impartial jury and a unanimous verdict. The People argue defendant forfeited the issue by failing to object at trial; counsel invited error by requesting CALCRIM No. 3551; and the trial court's questioning was appropriate and noncoercive. Defendant admits defense counsel did not object to the court's questioning of Juror No. 3 or to the court instructing the jury with CALCRIM No. 3551, but claims he did not request CALCRIM No. 3551 and thus did not invite error. Defendant argues if this court finds forfeiture, he was denied effective assistance of counsel.

### A.    *Forfeiture*

Error is not invited unless "the record [shows] that counsel made a conscious, deliberate tactical choice between having the instruction and not having it." (*People v. Cooper* (1991) 53 Cal.3d 771, 831.) Acceding to an instruction is not invited error unless counsel is found to have expressed the tactical purpose in doing so. (*People v. Scott* (2015) 61 Cal.4th 363, 400.)

On the second day of deliberations the trial court received a note from the jury regarding a problem with one of the jurors: "One juror has asserted his opinion and says he will not be swayed. He refuses to discuss the case with the group. His mind is made up. He is being somewhat combative with others. He has said 'I'm unwilling to talk about it' more than once. Do we

17

have the option to replace the juror with a less biased alternate juror?"

The trial court called counsel into court to discuss how the issue should be handled. The trial court began the discussion by describing various alternatives under the law, depending upon whether the juror was not deliberating well, had stopped deliberating after participating for a reasonable time, or had refused to deliberate altogether. The court concluded there was insufficient information to proceed without first questioning the foreperson, and possibly then each other juror individually. The court also suggested as another possibility, the giving of the instruction that tells the jury, "you need to go back and deliberate some more, which . . . is in part of the closing charge to the jury, [and] saying you need to . . . try your best to reach a unanimous verdict. The court clarified it was CALCRIM No. 3551, which was "further instructions about deliberations." Defense counsel agreed with this approach and said, "I think the court should reread that instruction to them. And . . . the next step would be if it continues to be a problem, then you question the jurors."[5] But the trial court and the prosecutor thought there should be questioning first. After questioning Juror No. 11 (the foreperson), Juror No. 3 (the complained of juror), and two other jurors, the court said it would "give [CALCRIM No.] 3551 about further instructions about deliberations and see what happens at that point. [¶] Okay?" Defense counsel replied, "That's fine." As

---

[5]     The court had not read CALCRIM No. 3551 prior to that discussion. CALCRIM No. 3550, the closing instruction, which contained similar language, had been read. Both defendant and the People surmise that defense counsel confused the two instructions.

18

counsel had already been overruled in the timing of the instruction, we conclude the response expressed acquiescence, rather than a deliberate tactical purpose, and is thus not invited error.

Defendant claims not to have forfeited his objection to the trial court's questions or instruction to the jury by failing to object, arguing the trial court had a sua sponte duty to determine how to handle the jury deadlock and thus no objection was required. Defendant cites section 1140 and *People v. Whaley* (2007) 152 Cal.App.4th 968, 980 (*Whaley*), neither of which provides authority for his contention. There is no sua sponte duty to give CALCRIM No. 3551 or otherwise instruct a deadlocked jury to continue its deliberations. (See Bench Notes to CALCRIM No. 3551 (Feb. 2012).) California Rules of Court, rule 2.1036(a), provides: "After a jury reports that it has reached an impasse in its deliberations, the trial judge *may*, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict." (Italics added.) Thus, the court *may* give additional instruction and *should* ask questions.

"The trial court's authority to give supplemental jury instructions to a deadlocked jury in a criminal case derives from Penal Code section 1140, which provides, 'Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no

19

reasonable probability that the jury can agree.'" (*Whaley, supra*, 152 Cal.App.4th at p. 979.)

"The determination under [section 1140] whether a reasonable probability of agreement exists 'rests in the discretion of the trial court.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 159.) And the failure to object to the court's determination forfeits the issue on appeal. (*People v. Sta Ana* (2021) 73 Cal.App.5th 44, 62–63.) Although defendant has forfeited his objections to CALCRIM No. 3551 and the questions to the jury, we address the merits of his claims as necessary to reach his ineffective assistance claim. (*People v. Osband* (1996) 13 Cal.4th 622, 693.)

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686; see Cal. Const., art. I, § 15.) To make out a claim that counsel rendered constitutionally ineffective assistance, it is the defendant's burden to show counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) A defendant must also show the record discloses counsel had no rational tactical purpose for the challenged act or omission, that counsel was asked for a reason and failed to provide one, or there could be no satisfactory explanation. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) In addition, resulting prejudice must be shown, "i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai, supra*, at p. 1009.)

## B.    *Coercion*

Defendant's argument regarding coercion, while not entirely clear, appears to be limited to his contentions the

20

questions asked of Juror No. 3 combined with the reading of CALCRIM No. 3551 pressured the jury into reaching a verdict, and the court should have instead declared a mistrial. "Coercion involves "'a judicial attempt to inject illegitimate considerations into the jury debates [and] . . . appeal to dissenting jurors to abandon their own independent judgment of the case against the accused,'" by exerting "'excessive pressure on the dissenting jurors to acquiesce in a verdict.'"" (*People v. Thomas* (2023) 14 Cal.5th 327, 403, quoting *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 461.)

Although "'the court must exercise its power [under section 1140] without coercion of the jury,' . . . [t]he question of coercion is necessarily dependent on the facts and circumstances of each case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 195–196, citation omitted.)

Here, jury deliberations began March 23, 2022, at 11:17 a.m., and the jury deliberated approximately one-half hour until a lunch break. After that the jury requested playback of defendant's two recorded interviews. The jury then returned to the jury room for almost an hour before being excused for the day. The second day deliberations were from 10:34 a.m. to 11:58 a.m., and from 1:30 p.m. until 1:45 p.m. when the note to the court regarding the problem with one of the jurors was sent.

In discussing the note with counsel, the court indicated the question presented was whether the subject juror was refusing to deliberate—defined in *People v. Cleveland* (2001) 25 Cal.4th 466, 485, as "unwillingness to engage in the deliberative process"— and not whether the juror uses faulty logic or simply disagrees with the other jurors after participating in deliberations for a reasonable period of time. After further discussion with counsel,

21

the court decided it was necessary to question the foreperson to determine the point the subject juror said he was unwilling to talk further.

Foreperson Juror No. 11 described the jury's initial 10 minutes in the jury room as a quick vote to see where they were, then began a discussion at which point Juror No. 3 expressed his opinion. He said he would not be changing his mind and did not want to talk about it. After many attempts to persuade Juror No. 3 to discuss his reasoning and asking him questions based upon trial evidence, he became aggressive, and cited the lack of evidence, and expressed personal biases.

Jurors have a duty to "'engage in the deliberative process.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 926; see *People v. Cleveland, supra*, 25 Cal.4th at p. 485.) A juror who refuses to deliberate is subject to discharge by the court for juror misconduct, and the trial court has a duty to conduct reasonable inquiry into allegations of juror misconduct, "always keeping in mind that the decision whether (and how) to investigate rests within the sound discretion of the court." (*People v. Engelman* (2002) 28 Cal.4th 436, 442; see § 1089.)

"On appeal, we review for abuse of discretion the trial court's decisions concerning whether and how to investigate the possibility that a juror should be discharged for failure to perform his or her duties, and whether, ultimately, to discharge the juror or to take some other action." (*People v. Alexander, supra*, 49 Cal.4th at p. 927.)

Our review of the proceedings reveals a reasonable and careful investigation by the court by discussing alternatives with both counsel, listening to their concerns, twice questioning foreperson Juror No. 11 and Juror No. 3 regarding the allegations

in the note, interspersed with discussions with counsel, and hearing from two other jurors, Juror No. 1 and Juror No. 2.

It is defendant's burden to demonstrate an abuse of discretion by showing the trial court's decision was irrational, arbitrary, or not "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.'" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.)

Defendant first takes issue with the manner in which the trial court "repeatedly" questioned Juror No. 3 and asked him to listen to other jurors after Juror No. 3 expressed concern about a lack of evidence to support the charges. Defendant begins his argument by speculating about what was *not* asked. The trial court did not ask for information about how jurors voted or their positions. Defendant contends the court should have known Juror No. 3 was holding out for acquittal, because he told the court he had concerns regarding the lack of evidence. In addition, although the trial court did not ask about the numerical division of the jury's votes, defendant refers to Juror No. 3 throughout his briefs as the *sole* or *lone* holdout and argues the court should have known the division was 11 to 1 for acquittal. Defendant then takes the position the court should have stopped questioning Juror No. 3 after realizing he might be holding out for acquittal.

Before questioning Juror No. 3, the court said: "'[D]on't tell me what your position on the case is. I don't want to know if you believe—if you're leaning towards guilty or not guilty. Don't tell me that. And don't also tell me what you believed the split is in the room in terms of how many jurors are one way and how many jurors are another way. I don't want to know that either." Juror No. 3 did not tell the court any of these things, and we do not

speculate on that point further despite defendant's urgings otherwise.

Defendant also claims the court should not have asked Juror No. 3 to listen to other jurors after he expressed concern that there was a lack of evidence to support the charges. There were four charges. Defendant does not say what charge or charges were the subject of the controversy; nor does he claim that the court was aware of which charge or charges were of concern. Yet defendant argues "the court should have known that the votes were most likely 11-1 in favor of conviction." As set forth in *People v. Carter* (1968) 68 Cal.2d 810, 817, footnote 5, an 11 to 1 numerical division does not necessarily mean that the lone juror is holding out for acquittal. We agree with the People that a concern regarding a lack of evidence does not necessarily mean a lack of prosecution evidence or a lack of evidence proving guilt, and we reject defendant's conclusion the trial court should have stopped questioning Juror No. 3 at that point.

As to questions the trial court asked, defendant contends the following questions put pressure on Juror No. 3 because they were not asked of the other jurors: ""But have you addressed [the other jurors]? Have you said, No. I have a contrary view because of 'Y,' as opposed to you're focusing on 'X' and I'm focusing on 'Y,' some sort of give and take?"; "But have you been willing to listen? Have you kept an open mind throughout the deliberations to hear other arguments of other jurors that might be contrary and reconsider—you don't have to surrender your beliefs about the evidence, but have you been willing to listen to what they're saying . . . ?" Defendant also claims after Juror No. 3 told the court he believed some witnesses but not others, the court asked him in essence whether he was biased, and did not ask other

24

jurors the same question.  The court actually said was it was Juror No. 3's prerogative to disbelieve some witnesses, "But what I'm asking, your belief or disbelief of witnesses, I take it, was based upon what they were saying and not the fact that they were a man or a woman or one socioeconomic status or one race or something like that?"

"'When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*.  [Citations.]'  [Citation.]  If the trial court has good cause to doubt a juror's ability to perform his duties, the court's failure to conduct a hearing may constitute an abuse of discretion on review.  [Citations.]  'Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists.'" (*People v. Lomax* (2010) 49 Cal.4th 530, 588.)  Moreover, "[b]ias is often intertwined with a failure or refusal to deliberate.  'A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge.'" (*Id.* at p. 589.)  To ask the same questions of other jurors is not required as the allegations of bias and failure to deliberate were leveled only at Juror No. 3, not at other jurors.  We conclude the court did not ""inject illegitimate considerations into the jury debates [or] appeal to [Juror No. 3] to abandon [his] own independent judgment,""" as coercion is defined in *People v. Thomas, supra*, 14 Cal.5th at page 403.

As questioning Juror No. 3 did not resolve the conflict between Juror No. 11's allegations and defendant's statements, the trial court's duty to investigate continued.  The trial court asked Juror No. 3 whether he kept an open mind throughout deliberations and listened to the other jurors and considered

contrary viewpoints or did he just say, "You know what? You know how you feel. That's it. I heard the evidence. I'm not going to listen to you," to which Juror No. 3 replied, "A combination of both." He explained, "I heard the evidence. I heard the testimony. And I just didn't want to be questioned more. I've already expressed it, and to do it again because they were hoping they could change my viewpoint. And I basically told them, 'If you have anything to convince me, please tell me.' [¶] . . . [¶] . . .And they didn't." Juror No. 3 said a few jurors explained the facts and evidence as they saw it and he listened but "didn't say anything back" other than "Okay." He could not remember exactly when he first expressed his opinion but surmised it was after an hour and a half into their discussion. He had listened to what they had to say but it did not convince him because, he said, "I've listened to the whole case and I have my opinion there."

The court then returned Juror No. 3 to the jury room and called back Juror No. 11, who told the court when some jurors pointed to specific reasons for their opinions, Juror No. 3's response "[n]early every time [has] been thrown hands in the air and said, 'I've already told you how I feel. I don't want to talk about it.'" Juror No. 11 said Juror No. 3 gave reasons that included a "mix of both, both the facts from the trial and personal feelings and experiences." He pointed mostly to a lack of things at trial. Juror No. 11 had initially drafted the note to the court the previous day but did not immediately submit it because she hoped matters would improve. Juror No. 3 did seem a bit more open to conversation on the second morning, but then everything quickly reversed.

Juror Nos. 1 and 2 were also questioned. Juror No. 1 told the court Juror No. 3 did not talk much in the beginning, "did

state why he believes in his opinion, but he didn't fully expand on it." Juror No. 1 also said the jury "took a vote pretty early yesterday," "[a]nd from that point he's been kind of stuck on his opinion, and we've asked him to expand more on why he feels this way. [¶] . . . [¶] [But] he didn't use much evidence to talk about why he felt this way." He kept saying, "This is how I feel. You're not going to change my mind and I'm not going to change your mind so there's no point for me to talk some more." In addition, Juror No. 1 told the court when Juror No. 3 did give reasons, they were mostly based "outside the trial itself," like "certain things about his life experience and what he thinks this type of person . . . would do in a situation," and it was like he was "pulling from past experience than he [wa]s pulling from the evidence of the case."

Juror No. 2 said Juror No. 3 had not been deliberating. He expressed his opinion but his reasons "seemed based on his personal experiences with police" without "specifying anything directly related to the evidence." Juror No. 2 said the jury had started conversing a bit after the court spoke to Juror No. 3, but had to stop when the court called out the other jurors. After that the trial court decided it might help deliberations to give CALCRIM No. 3551. Neither counsel objected, and the instruction was read: "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. So please consider the following suggestions: [¶] Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. [¶] Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the

27

evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict, if you can do so without surrendering your individual judgment. [¶] Do not change your position just because it differs from that of other jurors or just because you or other jurors want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror. [¶] It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. [¶] And let me know . . . whether I can do anything to help you further such as give additional instructions or clarify instructions I've already given you. [¶] So please continue your deliberations at this time. And if you wish to communicate with me further, please do so in writing [using the form my bailiff has given you]."

Defendant compares this instruction to an "Allen charge." The so called Allen charge was disapproved by the California Supreme Court as a "discriminatory admonition directed [only] to minority jurors to rethink their position in light of the majority's views." (*People v. Gainer* (1977) 19 Cal.3d 835, 845 (*Gainer*), disapproved on another point in *People v. Valdez* (2012) 55 Cal.4th 82, 163.) It is an instruction "which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Gainer, supra*, at p. 852.) Giving such an instruction "constitutes reversible error insofar as it addressed the minority and majority 'as distinct groups' and 'essentially mandated' that the jurors consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views." (*Valdez, supra*, at p. 161.)

Defendant asserts that CALCRIM No. 3551 as given here contained defects equivalent to those identified in *Gainer*. We disagree. The instruction contains none of the defects enumerated in *Gainer* or *Valdez*.

Defendant also asserts the sentence in CALCRIM No. 3551, "Do not hesitate to reexamine your own views," was the equivalent of instructing that "'a dissenting juror should consider whether his doubt was a reasonable one,'" a phrase in an instruction disapproved in *Gainer, supra*, 19 Cal.3d at page 845. *Gainer* disapproved that instruction because it was directed only to minority jurors, without making a similar request of majority's jurors. (*Ibid.*) The court found it to be "a judicial attempt to inject illegitimate considerations into the jury debates as an appeal to dissenting jurors to abandon their own independent judgment of the case against the accused." (*Id.* at p. 849.) There was no such effort here. The sentence, "Do not hesitate to reexamine your own views," was directed to all jurors. Moreover, the trial court admonished: "It is your duty as jurors to deliberate with the goal of reaching a verdict, if you can do so without surrendering your individual judgment. [¶] Do not change your position just because it differs from that of other jurors or just because you or other jurors want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror." (CALCRIM No. 3551.)

Defendant contends the phrase, "with the goal of reaching a verdict," in CALCRIM No. 3551 to be the equivalent of "'You should consider that the case must at some time be decided,'" another charge disapproved in *Gainer*, *supra*, 19 Cal.3d at page 851. On the contrary, CALCRIM No. 3551 includes the proviso, "*if* you can do so without surrendering your individual judgment."

29

(Italics added.)  Defendant seems to disregard that language.
The instruction given did not pressure any juror into
relinquishing their views in favor of reaching a unanimous
decision.  Quite the opposite.  The instruction was directed at the
entire jury, was not discriminatory or coercive, and as the People
point out, "was nothing like the disapproved instruction in
*Gainer*."  The instruction was persuasive, not coercive.

The People also point out, after the instruction was given,
the jury continued deliberating for 35 minutes that day without
reaching a verdict, and deliberated for nearly an hour the next
day before reaching its verdicts.  Also, the jury did not convict
defendant of all counts but acquitted him of count 4, the
kidnapping charge.  When the jury was polled, Juror No. 3
personally confirmed the verdicts were his.  The fact of the split
verdicts, the passage of time after having been given the
instruction, including the end of the day break, all demonstrate
the verdicts were not coerced.  This point was further affirmed by
Juror No. 3's own statement it was his verdict during polling.

Considering all the circumstances and instructions, we
conclude defendant's speculation as to what the trial court should
have known and his misinterpretations of CALCRIM No. 3551 do
not show Juror No. 3 or any juror was pressured to reach any
verdict.  Defendant has thus failed to demonstrate an abuse of
discretion.

Nor has defendant met his burden to show a miscarriage of
justice.  Defendant contends that because the court's error
deprived him of his rights to due process and a fair trial, the
People must show harmless error beyond a reasonable doubt.  As
defendant has failed to establish abuse of discretion or
instructional error, we also reject his constitutional claim that

30

the alleged error deprived him of his rights to due process and a fair trial. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 147.)

Again defendant relies on speculative assumptions which we have rejected as he reviews some of the evidence against him, in an effort to suggest the evidence against him was weak. Defendant concludes it is reasonably probable that Juror No. 3 would have continued to vote for acquittal if the court had not instructed *him* with CALCRIM No. 3551. The evidence does not support defendant's conclusion. We have already rejected defendant's claim of insufficient evidence to support his convictions.

Furthermore, as the People point out, defendant confessed that he had touched Holly after initially claiming he did not. This is most compelling evidence supporting conviction. In his initial interview, defendant insisted he touched Holly only on her arm in an effort to bring it back into the car, and he never touched her breasts or her vagina. He agreed his DNA might be on her thighs or leg because she was wearing a mini skirt, but it would not be inside her vagina. In his second interview, defendant claimed Holly grabbed his hands and put them in her top and on her vagina. Later in the interview, defendant admitted to having put his hand up Holly's skirt and was "playing" with her, when she grabbed his hands, "like um, she want more." He claimed to not remember putting his fingers inside her vagina but admitted touching "the top" of her vagina and rubbing the area of her clitoris.

Even if we assume Juror No. 3 was the sole holdout for acquittal on the sexual assault charges, Juror No. 2 indicated that Juror No. 3 had begun to engage a bit after the court spoke to him, but stopped when the court called for the other jurors.

31

After the hearing, the jury continued deliberating for 35 minutes that day without reaching a verdict, and then deliberated for nearly an hour the next day before reaching its verdicts. We conclude from Juror No. 3's apparent participation in discussions and his personal confirmation that the verdicts were his, that Juror No. 3 did deliberate, that the overwhelming evidence convinced him to vote to convict, and there was no reasonable probability of a different result. Defendant has demonstrated neither trial court error nor prejudice.[6]

## III. Alleged improper argument

Defendant contends "[t]he prosecutor committed misconduct during closing arguments by appealing to the passion and prejudice of the jurors" and engaged in "inflammatory characterization of the defendant" as a sexual predator without an evidentiary basis for the term. (Boldface & capitalization omitted.)

"'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] 'As a general rule a defendant may not

---

[6] Nor has defendant demonstrated ineffective assistance of counsel. As CALCRIM No. 3551 was not coercive and the trial court did not abuse its discretion, defendant has failed to show that defense counsel had no rational tactical purpose for acceding to the instruction or there could be no satisfactory explanation. (See *People v. Hoyt, supra*, 8 Cal.5th at p. 958.) In addition, he has not demonstrated a miscarriage of justice to support an abuse of discretion. We thus conclude he has not demonstrated prejudice required to support a claim of ineffective assistance of counsel. (See *People v. Mai, supra*, 57 Cal.4th at p. 1009.)

complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.] 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219.)

Defendant quotes several of the prosecutor's statements, claiming he objected to the first one but not to the other two. The first statement was made at the end of the prosecutor's opening statement, as follows: "The defendant tried to cast himself as the victim. He actually said to Officer Lee, that these girls are doing this shit—excuse my language, it's not my words, it's his—these girls are doing this shit all the time. [¶] Well, does he know something that we don't know? That—he tells—he told us that he deals with drunk people all the time. What? Girls are getting drunk and passing out in his car and becoming victims of sexual assault all the time."

Defense counsel objected on the general ground of "improper argument," and the court admonished the jury, "You'll base your verdict on the evidence in the case and the laws given to you by the court." Not only did defendant fail to ask the court to admonish the jury to disregard the alleged impropriety, he has expanded the grounds for his challenge here. He has thus failed to preserve his claim for appeal. (See *People v. Rangel, supra*, 62 Cal.4th at p. 1219.)

The other alleged improper statements were made in rebuttal. The prosecutor argued: "Instead of expressing shame and remorse for what he did, he blamed the victim. He demonized the victim, the same as the defense lawyer did in closing argument." After further argument, the prosecutor said: "If you cannot keep your hands to yourself when you see a drunk young lady, which apparently he can't because he said girls do this all the time, then maybe you shouldn't be an Uber driver. And had he not sexually assaulted a drunk, unconscious, unaware of what was happening girl who was fighting for her life when she finally woke up, we wouldn't be here. [¶] The reason why we're here is because of what the defendant did to Holly, what the defendant did to the People of the State of California. It's a crime against all of us."

Defendant did not object to these statements or request an admonition. The People contend defendant has forfeited his claim of misconduct. We agree. "A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) A "defendant's failure to raise an objection to a prosecutor's remarks and to request a curative instruction forfeits the objection." (*People v. Williams* (2016) 1 Cal.5th 1166, 1188.)

Defendant contends defense counsel rendered ineffective assistance in failing to object to the challenged remarks. To demonstrate ineffective assistance of counsel, defendant's first burden is to "show counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms. . . . [We defer] to counsel's reasonable

34

tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*People v. Mai, supra*, 57 Cal.4th at p. 1009.) As we have previously discussed above, the record must affirmatively disclose counsel had no rational tactical purpose for failing to object or there simply could be no satisfactory explanation. (*Ibid*.) "[A] mere failure to object to . . . argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739 772.) "[C]ompetent counsel may often choose to forgo even a valid objection." (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.) "Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments." (*People v. Ghent, supra*, at p. 773.)

Defendant makes the broad assertion that because an appeal to the passion and prejudice of the jurors could not have benefited him in any way, "[t]here could have been no tactical reason to fail to object to the prosecutor's misconduct." Defendant has merely expressed his opinion that there was no rational tactical purpose for not objecting. Defendant cites no authority which suggests that prevailing professional norm requires defense counsel to object to a prosecutor's comment simply because the argument is not beneficial to the defendant. As defendant does "not provide legal argument and citation to authority on each point raised, '"[we] may treat it as waived, and pass it without consideration."'" (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 363.)

Defendant has not shown the prosecutor's argument was improper or a reasonable likelihood the jury understood or

35

misapplied the challenged excerpts in an improper or erroneous manner. (See *People v. Rangel, supra*, 62 Cal.4th at p. 1219.) Defendant contends the excerpts from portions of the of the prosecutor's summation quoted above appealed to the passion and prejudice of the jurors without a basis in the evidence. For example, a statement defendant claims the prosecutor made with no evidence was that Holly woke up "fighting for her life." Defendant disregards Holly's testimony that when she woke up while defendant was assaulting her, she was terrified, thought he was going to kill her, and used all her strength in an effort to push his hand out. The jury heard Holly's testimony and could reasonably infer she was fighting for her life. We discern no reasonable likelihood the jury misunderstood or misapplied the comment. (See *ibid.*) And as defendant makes no real effort to argue this or other points in the context of all relevant evidence or the entirety of both summations, we will not individually discuss every alleged improper statement or insinuation.

Defendant essentially argues the *cumulative* effect of the excerpts portrayed him as, in defendant's words, "a lying, unreformed, dangerous sexual predator whose statements were not to be believed, and who should be convicted to keep him off the street regardless of the strength of the evidence of the current charge." Defendant concludes, "There was absolutely no basis for these statements." Defendant would be correct except the prosecutor did not say such things. Defendant broadly accuses the prosecutor of insinuating things about defendant and argues the implication that he was an unreformed dangerous sexual predator was not rooted in the evidence because (without citation to the record) this was his first sex offense and there was no evidence of prior felony convictions. Defendant has again relied

on broad statements to express his own opinion with no meaningful legal argument to support them. He has not even attempted to address the general scope of permissible prosecutorial argument.

Moreover, the only evidence of defendant's claim that this was a first sex offense was his own denial this had ever happened to him before, which was rendered hard to believe with his own statement that they "trick people, drivers and— because hey, a lot of girls, they're doing this shit. . . . You know, so they want to get money"; and made much less credible when defendant followed that statement by, "And . . . hey, we, we, we're mens." Defendant told the officer, "I've been doing this for years, sir. I'm dealing with drunk people all the time." Defendant's own statements beg the reasonable questions, how does defendant know this? And from his own experience? The alleged insinuation that defendant was a sexual predator and a repeat offender may have been harsh, unbecoming and insulting, but it was not unsupported by the evidence and not unreasonable given defendant's own words.

Improper argument consists of "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." (*People v. Lewis* (1990) 50 Cal.3d 262, 284.) Otherwise, the "'"prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.]

37

'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may "use appropriate epithets . . . ."'"' (*People v. Stanley* (2006) 39 Cal.4th 913, 951-952.) Even remarks that are "harsh and unbecoming," "hyperbolic and tendentious inferences from the evidence," or "'insulting,'" do not necessarily "amount to a deceptive or reprehensible method of persuasion." (*People v. Rowland* (1992) 4 Cal.4th 238, 276–277.) "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Nevertheless, defendant complains the prosecutor *repeatedly* suggested he was a sexual predator.[7] As much as defendant suggests otherwise, the prosecutor did not call defendant a predator or the many other insults and epithets she might have called him without resorting to "deceptive or reprehensible" methods of persuasion. (*People v. Rowland, supra*, at p. 274.)

Defendant also complains the prosecutor's comments portrayed him as a liar. We have already found compelling evidence of defendant's guilt, and as so many of defendant's statements to Officer Lee contradicted the strong evidence against him, it would not have been improper if the prosecutor *had* called him a liar. (See *People v. Friend* (2009) 47 Cal.4th 1, 32.)

Finally, defendant argues the prosecutor, in his words, "manipulat[ed] the jury into abandoning its impartial role, and to decide the case . . . based on their emotional biases and fears against sexual predators" with her statement that this was "a

---

[7] Calling a defendant a "predator," is not necessarily improper. (See *People v. Thomas* (2012) 54 Cal.4th 908, 943 [penalty phase].)

crime against all of us." The People point out the statements were made in rebuttal and directed to defense counsel's argument in which he told the jury: "You can't let sympathy that you have for Holly H. make the decision for you. . . . [¶] [T]his is not Holly H., 23-year-old woman versus what she described my client as 60-year-old crater face. . . . This is the People having to prove their case beyond a reasonable doubt. And you can't let your sympathy for Holly dictate to you what your verdict is." The People quote the prosecutor's *full* statement: "The reason why we're here is because of what the defendant did to Holly, what the defendant did to the People of the State of California. It's a crime against all of us." The prosecutor then continued with the following: "So the defense argument says don't have sympathy for Holly. We're not asking you to have sympathy for Holly. We're asking you to uphold the law because any of us is not any more valuable or less valuable than anyone else. If Holly was a—I don't know—think of the worst piece of scum on the earth, the law is there to protect her. The law is there to protect all of us to be free of being sexually assaulted by anyone." As we consider the People's point in the context of defense counsel's words and the prosecutor's full statement, the challenged statement merely reflected the reality that the law was enforced for all people, sympathetic or not. So viewed, it was not improper argument, and as defendant has not shown a reasonable likelihood that the jury construed the remarks in an objectionable fashion, he has demonstrated neither misconduct nor prejudice. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841–842.)

In sum, defendant has not shown any of the prosecutor's remarks to have been improper, nor a reasonable likelihood the jury understood them in an improper or erroneous manner.

There was thus no prosecutorial misconduct, and because counsel thus had no reason to object or request an admonition, defendant's ineffective assistance claim fails.  (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

## IV.    No cumulative error

Defendant contends the cumulative effect of the multiple errors he has asserted requires reversal even if each such error would not be independently reversible.  As we have rejected on the merits all of defendant's claims of error there can be no cumulative prejudicial effect.  (See *People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## V.    Consecutive sentence

Defendant contends a full consecutive middle term sentence of six years as to count 3 was an unauthorized sentence enhancement, and he should instead have been sentenced under section 1170.1.

The trial court sentenced defendant on count 2 to a middle term and on count 3 to a consecutive middle term under the provisions of section 667.6, subdivision (d)(1), which provides: "A full, separate, and consecutive term *shall* be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on *separate* occasions."  (Italics added.)  "The term shall not be included in any determination pursuant to Section 1170.1."  (§ 667.6, subd. (d)(3).)  Defendant was convicted of sexual penetration in violation of section 289, subdivision (a)(1)(A), an offense listed in section 667.6, subdivision (e)(8).

At the start of the sentencing hearing the trial court pointed out several typographical errors in the prosecutor's sentencing memorandum, one of which is relevant here.  The

40

court noted that the memorandum requested sentencing under section 667.61, subdivision (d) but the calculations indicated sentencing under section 667.6, subdivision (c). The prosecutor explained she meant section 667.6, subdivision (d). The defense sentencing memorandum requested sentencing under section 667.6, subdivision (c). At sentencing however, defense counsel indicated he did not come prepared to argue section 667.6, subdivision (d).[8] The People contend this issue has been forfeited by defendant's failure to object to sentencing under section 667.6. We consider defense counsel's statement regarding preparedness sufficient to preserve the issue.[9]

On appeal, relying primarily on section 667.61 (the One Strike law) and *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*), defendant argues that section 667.6 provides for a sentence enhancement that may not be imposed at all unless pleaded and proven. There is no such notice requirement in section 667.6, subdivision (c), and thus not in subdivision (d). (See *People v. Belasco* (1981) 125 Cal.App.3d 974, 984 [discussing § 667. 6, subd. (c)].)[10] Section 667.6, subdivisions (c) and (d) are not sentence enhancement provisions, but rather "a sentencing scheme that prescribes terms of imprisonment for enumerated

---

[8] Subdivisions (c) and (d) of section 667.6 are substantially similar except that subdivision (d) is mandatory for an offense specified in subdivision (e), whereas subdivision (c) vests the trial court with *discretion* to impose full consecutive sentences in lieu of section 1170.1 if a sexual offense specified in section 667. 6, subdivision (e) involves the same victim on the *same* occasion.

[9] We thus do not reach defendant's claim of ineffective assistance of counsel.

[10] See footnote 8, *ante*.

41

sex offenses." (*People v. McPherson* (2001) 86 Cal.App.4th 527, 531–532 [discussing § 667. 6, subd. (d)].)[11]

Defendant argues that *Mancebo* applies here because it relied in part on principles of due process when it held that "a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*Mancebo, supra*, 27 Cal.4th at p. 747.) However, only subdivisions (a) and (b) of section 667.6 provide for sentence enhancements, and defendant was not sentenced under those subdivisions. (See *People v. Stought* (1981) 115 Cal.App.3d 740, 742.) As the trial court did not impose sentence enhancements the only pleading and proof required for imposing full consecutive sentences were the elements of the charged crime, which were coextensive with the conditions of section 667.6, subdivision (d). (*People v. Mitchell* (1988) 199 Cal. App. 3d 300, 306, fn. 7 [discussing § 667.6, subd. (c)].)

Defendant concludes otherwise because *Mancebo* generally expresses the due process principle that *circumstances* that were not pled and proved cannot substituted for those that were. (See *Mancebo, supra*, 27 Cal.4th at p. 743.) That has not happened here.[12] Moreover, "due process does not require 'rigid code

---

[11]     A sentence enhancement is "'an additional term of imprisonment added to the base term,'" while a sentencing scheme is "a separate sentencing formulation." (*People v. Anderson* (1995) 35 Cal.App.4th 587, 595.)

[12]     *Mancebo* involved "the narrow question . . . whether the circumstance of gun use was available to support two section 12022.5(a) enhancements when gun use had already been properly pled and proved as a basis for invoking One Strike

pleading or the incantation of magic words.' [Citation.]  An accusatory pleading need not specify the number of the pertinent sentencing statute, so long as it otherwise clearly notifies the accused of the factual basis on which it is seeking a longer sentence and the information necessary to calculate sentencing exposure." (*In re Vaquera* (2024) 15 Cal.5th 706, 719–720.)

The circumstances of section 667.6, subdivisions (c) and (d) were adequately pled in this case.  Count 3 of the information charged defendant with an offense specified in section 667.6, subdivision (e)(8), forcible sexual penetration involving the same victim on the same day.  If found to have been committed on the same occasion, full consecutive sentencing would be discretionary under section 667.6, subdivision (c).  If found to have been committed on separate occasions, full consecutive sentencing would be mandatory under section 667.6, subdivision (d).

"In determining whether crimes against a single victim were committed on separate occasions under [subdivision (d)], the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d)(2).)

---

sentencing." (*Mancebo*, *supra*, 27 Cal.4th at p. 738.)  The two firearm enhancements had not been pled or proven and thus could not be imposed at sentencing by borrowing facts from the properly pled and proved section 667.61 sentencing scheme. (*Mancebo*, at pp. 739–740.)

43

At the preliminary hearing in October 2019, Holly testified much as she did almost one and a half years later at trial. She described how she became intoxicated at the Bungalow Bar, called an Uber, passed out after (she thought) she got into the back seat, and when she came to she was in the reclining front seat. It took her minutes to wake up and realize defendant was moving two fingers in and out of her vagina with his penis exposed, using his other hand to masturbate. She recounted saying "No, no, no," progressively louder and then as defendant continued, having to push his hand with all her strength for about two minutes before overcoming his greater strength.

Holly's saying "No, no, no," and then her two-minute resistance afforded defendant ample opportunity to reflect on his conduct and stop his sexual assault, but he nevertheless applied force to continue to sexually assault her. We conclude defendant had sufficient notice of the facts of the crime that once proven qualified him for sentencing under section 667.6, subdivision (d). He was thus not denied due process.

## DISPOSITION

The judgment is affirmed.

_____
CHAVEZ, J.

We concur:

_____      _____
LUI, P. J.      ASHMANN-GERST, J.

44